1

2

3

4

5

6

7

The Honorable Richard A. Jones

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   BUNGIE, INC.,

11                          Plaintiff,

12              v.

13   L.L.,

14                          Defendant.

15

16

Case No. 2:22-cv-00981-RAJ

PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANT L.L.'S
MOTION TO DISMISS

**NOTED ON MOTION CALENDAR:
September 30, 2022**

**ORAL ARGUMENT REQUESTED**

17

18

19

20

21

22

Akiva M. Cohen
Dylan M. Schmeyer
KAMERMAN, UNCYK,
   SONIKER & KLEIN P.C,
1700 Broadway, 16th Floor
New York, NY 10019
212.400.4930
acohen@kusklaw.com
dschmeyer@kusklaw.com

Brian W. Esler, WSBA No. 22168
MILLER NASH LLP
Pier 70
2801 Alaskan Way, Suite 300
Seattle, WA 98121
Telephone: (206) 624-8300
Fax: (206) 340-9599
Email: brian.esler@millernash.com

23

24

25

26

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 1

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1

2

# **Table of Contents**

3

I.    Introduction ..................................................................................................... 1

4

II.   Statement of Facts ............................................................................................ 2

A. The Parties .................................................................................................. 3

5

B. *Destiny 2*, Cheating, and the LSLA ........................................................... 3

C. L.L. Repeatedly (and Fraudulently) Executes Bungie's LSLA ................. 5

6

D. L.L.'s Cheating and Bans ........................................................................... 5

7

E. L.L.'s Emblem Sales .................................................................................. 6

8

F. Bungie Links All of the Above Conduct to L.L. and Sues ........................ 7

G. L.L. Disaffirms the LSLA That Licensed His Use of *Destiny 2* ............... 8

9

III.  Argument ......................................................................................................... 8

10

A. Standard on a Motion to Dismiss ............................................................... 8

11

B. L.L.'s Disaffirmance of the LSLA Requires Dismissal of the Breach of Contract
   Claims – But Also Renders All of his Prior Downloads, Plays, and Streams of
   *Destiny 2* Unlicensed and Infringing, and Concedes Bungie's Infringement Claims ........9

12

C. Bungie's Fraud in the Inducement Claim Was Well-Pled ........................10

13

D. Even Without the Disaffirmance or Fraud, L.L. Infringed Bungie's Copyrights .............12

14

1. L.L.'s Use of Cheat Software Terminated the LSLA and Rendered His Use
   of *Destiny 2* Infringing .......................................................................... 13

15

E. L.L.'s Anticircumvention Defenses Fail ...................................................17

16

F. Bungie's Claim for Violation of the Washington Consumer Protection Act is Well-
   Pled ............................................................................................................21

17

IV.   Conclusion ..................................................................................................... 23

18

19

20

21

22

23

24

25

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

# Table of Authorities

Page

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ................................... 8

*Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083 (W.D. Wash. 2011) ........................ 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, L.Ed.2d 929 (2007) ......................... 8

*Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065 (9th Cir. 2021) ............................................ 12

*Blizzard Entm't, Inc. v. Bossland GmbH*, SACV161236DOCKESX, 2017 WL 7806600
(C.D. Cal. Mar. 31, 2017) .................................................................................................. 16

*Boy Blue, Inc. v. Brown*, 74 Va. Cir. 4 (2007) ................................................................................ 9

*Boyden v. Boyden*, 50 Mass. 519 (1845) .......................................................................................... 9

*Cave Man Kitchens Inc. v. Caveman Foods, LLC*, 2:18-CV-01274 RAJ, 2019 WL 3891327
(W.D. Wash. Aug. 19, 2019) ............................................................................................... 3

*Cleverly v. Ballantyne*, No. 212CV00444GMNGWF, 2013 WL 12320134
(D. Nev. Aug. 29, 2013) ..................................................................................................... 11

*Davidson & Associates v. Jung*, 422 F.3d 630 (8th Cir. 2005)...................................................... 21

*Doenges-Long Motors, Inc. v. Gillen,* 138 Colo. 31, 328 P.2d 1077 (1958)................................. 9

*Gage v. Menczer*, 144 S.W. 717 (Tex. Civ. App. 1912) ................................................................. 9

*Harvey v. Briggs*, 68 Miss. 60, 8 So. 274 (1890)............................................................................ 9

*Jackowski v. Borchelt*, 174 Wn.2d 720, 278 P.3d 1100 (2012)..................................................... 12

*Jacobsen v. Katzer*, 535 F.3d 1373 (Fed. Cir. 2008) ................................................................... 15

*Khmaissi v. Navient Sols. LLC*, 20-6226 RJB, 2021 WL 243396 (W.D. Wash. Jan. 25, 2021) .... 8

*Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 295 P.3d 1179 (2013) ............................................. 22

*Landstar Inway Inc. v. Samrow*, 181 Wn. App. 109, 325 P.3d 327 (2014)................................... 10

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)............................................................... 8

*Lewis Galoob Toys, Inc. v. Nintendo of America*, 964 F.2d 965 (9th Cir. 1992) ........................ 16

*Liberty Mut. Ins. Co. v. Conley*, 152 So. 2d 521 (Fla. Dist. Ct. App. 1963)................................. 9

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

*MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993)................................. 12

*McAfee v. Select Portfolio Servicing, Inc.*, 193 Wn. App. 220, 370 P.3d 25 (2016)................... 10

*MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g*, No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011) .................................... passim

*Micro Star v. Formgen Inc.*, 154 F.3d 1107 (9th Cir. 1998) ................................................. 12, 16

*Microsoft Corp. v. EEE Business Inc.*, 555 F.Supp. 2d 1051 (N.D. Cal. 2008) .......................... 21

*Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948 (9th Cir. 2018).................................. 12, 20

*Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 204 P.3d 885 (2009) ......................... 21, 22

*Paulson v. McMillan*, 8 Wn. 2d 295, 111 P.2d 983 (1941) ...................................................... 11

*Petersen v. Turnbull*, 68 Wn.2d 231, 412 P.2d 349 (1966) ..................................................... 10

*Plummer v. N. Pac. Ry. Co.*, 98 Wash. 67, 167 P. 73 (1917) ...................................................... 1, 9

*Smoot v. Ryan*, 187 Ala. 396, 65 So. 828 (1914) ....................................................................... 9

*Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068 ............................................ 17

*Synopsys, Inc. v. InnoGrit, Corp.*, 19-CV-02082-LHK, 2019 WL 4848387 (N.D. Cal. Oct. 1, 2019)..................................................................................................... 21

*Tacoma Northpark, LLC v. NW, LLC*, 123 Wn. App. 73, 96 P.3d 454 (2004) ......................... 14

*U.S. v. Watkins*, 278 F.3d 961 (9th Cir. 2002)....................................................................... 19

*Windisch v. Farrow*, 159 S.W.2d 392 (Mo. App. 1942)............................................................ 9

**Statutes**

17 U.S.C. §1201 ............................................................................................................. 17, 18, 19

18 U.S.C. § 1030 ................................................................................................................... 20

RCW 19.86.090 .................................................................................................................... 21

RCW 19.86.920 .................................................................................................................... 22

RCW 26.28.030 ...................................................................................................................... 8

**Rules**

Fed. R. Civ. P. 12(d) ............................................................................................................... 2

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - iii

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

Fed. R. Evid. 201 ................................................................................................................. 8

**Treatises**

5 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 9:14
(4th ed. 1993 & Supp. 2011)............................................................................................. 9

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - iv

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1

2

## I.    **INTRODUCTION**

3
       By his own admission in his motion to dismiss (Dkt. #18, the "Motion") and his

4
disaffirmance of his multiple agreements with Plaintiff Bungie, Inc. ("Bungie"), Defendant is a

5
teenager who has made a series of bad decisions. He has tweeted threats at Bungie and its

6
employees (Dkt. #18 at pp. 10-11), cheated in Bungie games (Dkt. #1, the "Complaint" at ¶¶ 65-

7
77; Dkt. #18 at 2-3), and seems to have participated in outright criminal behavior. Complaint at

8
¶ 5. But perhaps no decision L.L. has made is as self-destructive as his decision, when sued for

9
copyright infringement, to exercise his right as a minor to disaffirm the very license agreement

10
that provided his only potential defense to the claims. Without a license, all of L.L.'s gameplay

11
becomes infringing activity.

       A minor's disaffirmance of his contract renders the disaffirmed agreement void *ab initio*,
12
requiring the Court to treat the parties *as though the contract never existed in the first instance.*
13
*Plummer v. Northern Pac. Ry.*, 98 Wash. 67, 70, 167 P. 73 (1917). Thus, when L.L. filed his
14
"Notice of Disaffirmance," he retroactively erased any authorization he had to download, install,
15
copy (to random access memory ("RAM") or otherwise), play, or stream *Destiny 2*, or to possess
16
(let alone sell) any of its "Live Content" (such as emblems).
17
       In light of that disaffirmance, L.L.'s reliance on the Ninth Circuit's decision in *MDY*
18
*Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928 (9th Cir. 2010), *as amended on denial of reh'g*
19
(Feb. 17, 2011), *opinion amended and superseded on denial of reh'g*, No. 09-15932, 2011 WL
20
538748 (9th Cir. Feb. 17, 2011) is as irrelevant as it is wrong. Not only does L.L. ignore the
21
differences between Bungie's license agreement here (the "LSLA") and the license at issue in
22
*MDY*, but his disaffirmance voided the license in its entirety, and he therefore cannot rely on it as
23
a defense at all.[1]
24

25
_____

26
[1] In that sense, it is similar to the three pages L.L. spent arguing that his threats to Bungie and its employees –
including noting that he was moving within 30 minutes of Dylan Gafner, a Bungie employee who was therefore "not
safe – were protected by the First Amendment. Not only is that wrong, but it is wholly irrelevant because L.L.'s

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

The Motion does no better on the substance of Bungie's claims. L.L.'s discussion of Bungie's anticircumvention claims is incoherent, both technologically and legally. L.L.'s motion makes incorrect factual claims about where data resides (not cognizable on a motion to dismiss), confuses the Digital Millennium Copyright Act's ("DMCA") anticircumvention provisions (which govern access to a *work*) with the Computer Fraud and Abuse Act ("CFAA") (and its focus on unauthorized access to a *computer*), and simply ignores Bungie's allegations that L.L. used hardware spoofing technology to evade Bungie's hardware ID detection system. And the arguments for dismissal of Bungie's fraud in the inducement and Washington Consumer Protection Act ("CPA") claims are somehow even worse. On the fraud in the inducement claims, and without any apparent sense of irony, L.L. argues that Bungie *could not have relied on* his false representations that he would abide by the LSLA, because it automatically allows all users to access *Destiny 2 once they make such a representation*. And with respect to the Consumer Protection Act, L.L. simply ignores both his alleged (and admitted) conduct and the relevant precedent. The motion must be denied.

## II.   STATEMENT OF FACTS

On this motion to dismiss, the Court must accept the well-pled facts of the Complaint as true and may not consider factual claims outside the Complaint.[2]  The relevant facts are these:

---

threats are not elements of Bungie's claims.

That said, one element of that argument is too clearly made in bad faith to allow to pass without comment. In his Motion, L.L. attempts to recast his realization that *the place to which he was moving in Washington was close to Mr. Gafner's home* as a sudden realization *that he was moving to Washington at all*, and therefore somehow evidence that his move was not "of his own free will." Dkt. #18 at 10-11. Aside from L.L.'s intended meaning when making his threats being a factual issue, the Motion does not explain how L.L. could "realize" that he was moving to Washington, whether of his own volition or at all. He could choose it, or he could be told of a family move – but to "realize" it he would have to have not known that the location he was moving to was in Washington, and then suddenly have had an epiphany about which of the 50 states that location was in. *Of course* that isn't what happened, and *of course* L.L.'s "realization" was how close he would be *to Mr. Gafner*. L.L.'s willingness to make the contrary and false factual representation to the Court in an attempt to evade liability speaks volumes.

[2] For instance, L.L.'s claim that he paid full price for the emblems he sold on the OGUsers.com black market, Dkt. #18 at 6, is a contested fact that cannot be considered. Fed. R. Civ. P. 12(d).

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT L.L.'S MOTION TO DISMISS - 2

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  **A.**    **The Parties**

2      Bungie is a video game development studio based in Bellevue, Washington, and the

3  creator, owner, and intellectual property rights holder for *Destiny 2*. Complaint at ¶¶ 10, 16. L.L

4  is a (now-former) *Destiny 2* player residing in Vancouver, Washington. *Id.*, ¶ 11. Pursuant to his

5  filings in this action, of which the Court may take judicial notice, *see Cave Man Kitchens Inc. v.*

6  *Caveman Foods, LLC*, 2:18-CV-01274 RAJ, 2019 WL 3891327, at *2 (W.D. Wash. Aug. 19,

7  2019), L.L. is a minor.[3]  Dkt. # 12.

8  **B.**    ***Destiny 2*, Cheating, and the LSLA**

9      *Destiny 2* is a shared-world, online first-person shooter that allows players from around

10  the world to see and interact with each other's characters. Complaint at ¶ 17. It uses a free-to-

11  play business model, in which the base game may be played at no charge. *Id.*, ¶ 18. Bungie's

12  income comes from players who enjoy the game enough to purchase optional content that

13  enhances the basic experience. *Id*. The success of *Destiny 2* thus depends on Bungie's ability to

14  provide an in-game experience that players enjoy and value. *Id.*, ¶ 19.

15      Cheaters create an in-game experience other players intensely dislike. *Id.*, ¶ 20. The game

16  is specifically designed to present challenges for players. For example, ammunition for powerful

17  in-game weapons is intentionally limited, and while the game servers are aware of the location of

18  every player, obstacle, and computer-generated enemy, and transmit that information to the game

19  client, the game client software is designed to hide that data from the players. *Id.*, ¶ 166. For

20  example, enemies (including other players) behind walls or obstacles are not visible to the

21  player, and their location not precisely called out to the player, until the player's character is in

22  position to see them. *Id.*, ¶ 167. When an honest player faces a cheater who can see and shoot

23  through walls with infinite ammunition, *id.*, ¶ 73, the honest player will typically lose. *Id.*, ¶ 20.

24

25

---

26  [3] Bungie was unaware of L.L.'s age when it filed this action, because – among other reasons – L.L. had
misrepresented himself as a 23-year-old on his public profiles and had provided Bungie with credit card information.

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 3

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    When players have bad in-game experiences, particularly when they are the victims of

2    cheating, they play the game less, and may stop playing at all. Complaint at ¶ 20. Because

3    cheating is a significant threat to *Destiny 2*'s commercial success, *id.*, ¶ 19, Bungie devotes

4    substantial time, effort, and resources to preventing cheating. *Id.*, ¶ 21.

5    As a free-to-play game, users can download and use Bungie's copyrighted *Destiny 2*

6    software for free so long as they agree to Bungie's license terms. *Id.*, ¶¶ 18, 21-22. Because

7    cheating has a negative impact on player experience, and positive player experience is an aspect

8    of customer satisfaction, Bungie expressly conditions its license on the player's agreement that

9    they will not "hack or modify the game," "receive or provide boosting services to…achieve

10   results that are not solely based on the account holder's gameplay," or "use any unauthorized

11   software programs to gain advantage in any online or multiplayer game modes." *Id.*, ¶ 22

12   & Ex. 1. The LSLA is unambiguous about what this means: by accepting the LSLA, players

13   agree that such conduct will automatically terminate their license and, therefore, that "continued

14   use of the Program will be an infringement of Bungie's copyrights." *Id.* at Ex. 1 at 3-4. Bungie

15   has simply never licensed *any* user who has employed cheat software in connection with

16   *Destiny 2* to continue to display or copy *Destiny 2* after that use of cheat software. *Id.*

17   And Bungie protects access to *Destiny 2* using several additional layers of technological

18   protection. First, no player can access *Destiny 2* without having agreed to the LSLA. Complaint ¶

19   22. Second, as discussed above, the game software is designed to limit the player's access to data

20   and control the information presented on the screen. *Id.*, ¶ 166-167. *Destiny 2* also incorporates

21   software that scans the player's RAM and game-related files to ensure that players are not using

22   cheat software while playing the game, *id.*, ¶ 164 and Ex. 1 at 7, while other cheat detection

23   measures identify suspicious player movements and monitor various values to ensure they

24   remain within expected ranges. *Id.*, ¶ 165. When these measures detect cheating, the cheater is

25   banned and their access to *Destiny 2* terminated, *id.*, ¶ 168, and Bungie also uses technological

26   protection measures ("TPM") to prevent banned players from returning to the game, such as

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 4

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    requiring phone-number verification before unlocking certain content. Complaint at ¶ 71. More,

2    the *Destiny 2* software incorporates measures such as hardware ID detection, whereby a

3    computer or console is assigned an identifier based on characteristics of its hardware

4    configuration, in order to block banned users from accessing *Destiny 2* at all. *Id*., ¶¶ 29, 174. All

5    of these measures control and limit access to *Destiny 2* and its data. *Id*., ¶ 171.

6    **C.    L.L. Repeatedly (and Fraudulently) Executes Bungie's LSLA**

7        L.L. indicated his agreement to Bungie's LSLA not just once, but at least fifteen times.

8    Complaint at ¶¶ 26-51.[4] L.L. created two accounts on April 6, 2020: one that was initially named

9    "Knight1y" and subsequently changed to "inkpai;" and another that was initially named

10   "Niight1y" and subsequently changed to "inkums." *Id*. ¶ 88. L.L. created 13 additional Bungie

11   accounts between December 6, 2021 and June 10, 2022. *Id*., ¶¶ 26-51. Four of these were banned

12   when L.L. was caught streaming cheating content, four were banned when caught cheating by

13   Bungie's TPMs, four more when identified as ban evasion measures, and one when caught as a

14   ban evasion account based on its hardware ID. *Id*. By his own admission, and at least with

15   respect to the times he executed the LSLA after being banned for the first time, L.L. never

16   intended to abide by the license conditions he feigned agreement to. *Id*., ¶ 68.

17   **D.    L.L.'s Cheating and Bans**

18       As L.L.'s Motion admits, he made "no secret of the fact" that he cheats at *Destiny 2*. Dkt.

19   #18 at pp. 2-3. L.L often streamed himself cheating on his Twitch channel, miffysworld.

20   Complaint at ¶ 25. L.L's Twitter account, @inkcel, tweeted video clips that showed him cheating

21   at *Destiny 2* using multiple *Destiny 2* accounts. *Id*., ¶ 67. And L.L. bragged about cheating in

22   many of his tweets. On May 27, 2022, L.L. tweeted "i will cheat on main i think." *Id*., ¶ 69. On

23   June 4, 2022, L.L. quote-tweeted a user who complained to Bungie about his cheating, saying

24   "this is true." Complaint at ¶70. The next day, he reminded his Twitter followers that the

25

26   ───────────────
     [4] L.L. judicially admitted entering these agreements in his Notice of Disaffirmance. Dkt. No. 17.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    discussions about him cheating "started from a clip of me flying with infinite ammo walls and

2    aimbot." *Id.*, ¶ 73. And on July 4, 2022, L.L. declared his intention to "hard cheat for world first

3    raid." *Id.*, ¶ 77.

4         L.L. also repeatedly and knowingly evaded the ban Bungie imposed on him the first time

5    he was caught cheating at *Destiny 2*. On May 27, 2022, L.L. responded to a Twitter user who

6    asked him how often he made new accounts, saying "this is my third account,

7    TECHNICALLYYY i've only been banned once." *Id.*, ¶ 67.[5]  On June 9, 2022, L.L. tweeted a

8    screenshot showing that an additional account had been banned, *id.*, ¶ 74, and on June 11, 2022,

9    tweeted "7 bans in and still going strong."[6] *Id.*, ¶ 75. And L.L. bragged on Twitter about evading

10   both bans and the TPMs Bungie used to enforce bans. On May 27, 2022, L.L. tweeted, "i don't

11   think i'll ever get banned from making new accounts lolo bungie not smar." *Id.*, ¶ 68. On June 5,

12   he tweeted how he bypasses the phone verification used to restrict free-to-play access to

13   activities, explaining that "when the game went free to play, any account without expansions

14   (usually cheaters) had to verify a phone number…buttt you can just pay $1 instead." *Id.*, ¶ 71.

15   And on June 11, 2022, L.L. tweeted that he was evading anti-cheat and hardware ID measures

16   Bungie used to keep banned players from accessing the game: "battleye is shit took me 30

17   seconds to get around your silly hardware ban." *Id.*, ¶ 76.

18        **E.    L.L.'s Emblem Sales**

19        In addition, L.L. repeatedly engaged in sales of *Destiny 2* emblems, which are digital art

20   badges that Bungie makes available to *Destiny 2* players as a reward for in-game achievements

21   or real-world conduct. Complaint at ¶ 5.  He did so on both Twitter, *id.*, ¶ 86, and the notorious

22   OGUsers.com black market. *Id.*, ¶¶ 87, 99-101. Emblems are non-transferable, and are prized by

23   many players, particularly collectors. *Id*. The sale of emblems is a violation of the LSLA, and the

24

25   [5] This was untrue. L.L. had created at least 7 *Destiny 2* accounts by that time, three of which had already been banned. Dkt. #1 at ¶¶ 26-34, 88.

26   [6] L.L. had been banned at least 12 times by this point. Dkt. #1 at ¶¶ 27-50.

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 6

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   sale of emblems through account-sharing or account-linking circumvents TPMs employed to

2   ensure that only the intended recipient of an emblem can display that art asset. *Id*., ¶¶ 6-8. The

3   sale of emblems also devalues the emblems for the collectors who legitimately earn them, and, in

4   the case of emblems awarded for charitable giving, harms the Bungie Foundation's ability to

5   fund charitable causes. *Id*. L.L. in fact sold such charity-related emblems, taking money from

6   charity. *Id*., ¶¶ 99-101.

7       **F.    Bungie Links All of the Above Conduct to L.L. and Sues**

8           Bungie was able to link all of this conduct to L.L. by connecting his Bungie accounts

9   with his Twitter and OGUsers accounts, which L.L. no doubt believed were sufficiently

10  anonymous. L.L. first came to Bungie's attention when he tweeted a serious threat to one of

11  Bungie's community managers, Dylan Gafner, from his "@inkcel" Twitter account, announcing

12  that he was moving to Mr. Gafner's neighborhood and that, as a result, Gafner was "not safe."

13  Complaint at ¶¶ 54-57. Review of L.L.'s other tweets identified not only the admissions of

14  cheating and evidence of emblem sales, but other disturbing tweets aimed at Bungie and

15  Mr. Gafner. *Id*., ¶¶ 58-59 (additional tweets directed at Mr. Gafner), ¶¶ 61-62 (threats directed at

16  Bungie offices), ¶¶ 63-64 (harassment of Bungie staff).[7]

17          Bungie identified several of L.L's *Destiny 2* accounts by examining the videos L.L.

18  posted to his @inkcel Twitter account that showed himself cheating. *Id*., ¶¶ 27, 30-35. It then

19  connected L.L. to other accounts, emails, and his OGUsers accounts via IP logs and email

20  addresses. *Id*., ¶¶ 88-111. Having identified L.L. as the person threatening Bungie's employee,

21  blatantly infringing Bungie's copyrights and breaching Bungie's license agreement, and

22  bragging that Bungie could not stop him from continuing to do so, Bungie brought this action for

23

24  [7] The allegations in the Complaint detailing Bungie's investigation of L.L. and his threats were included not because
    L.L.'s threatening conduct is an element of any of Bungie's causes of action, but because his threatening tweets and
25  other Twitter conduct were the connective tissue that sparked Bungie's investigation and eventual identification of
    L.L. Thus, aside from the Court's inability to consider on this motion L.L.'s self-serving attorney argument –
26  unsupported by evidence of record – that his threats were never intended seriously, the question of whether his
    tweets were "true threats" is legally irrelevant.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    breach of the LSLA, fraudulent inducement, copyright infringement, violation of the DMCA's

2    anticircumvention provisions, and violation of Washington's CPA.

3         **G.     L.L. Disaffirms the LSLA That Licensed His Use of *Destiny 2***

4         On September 8, 2022, L.L. filed a notice of disaffirmance by which he disaffirmed,

5    under RCW 26.28.030, "any and all contracts between himself and Bungie, Inc…including but

6    not limited to those alleged in the Complaint." Dkt. # 17. That disaffirmance is, for the most part,

7    the basis for L.L.'s motion to dismiss.[8]  As set out below, Bungie's claims are well-pled, and the

8    Motion should be denied.

9                   **III.     ARGUMENT**

10        **A.     Standard on a Motion to Dismiss**

11        On a motion to dismiss for failure to state a claim, the Complaint's material allegations

12   are taken as admitted and the Complaint is construed in the plaintiff's favor. *Khmaissi v. Navient*

13   *Sols. LLC*, 20-6226 RJB, 2021 WL 243396, at *1 (W.D. Wash. Jan. 25, 2021). To survive a

14   motion to dismiss, a plaintiff need only plead "enough facts to state a claim to relief that is

15   plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1973,

16   L.Ed.2d 929 (2007). "[F]acial plausibility" exists "when the plaintiff pleads factual content that

17   allows the court to draw the reasonable inference that the defendant is liable for the misconduct

18   alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing

19   *Twombly*, 550 U.S. at 556). So long as the factual allegations "raise a right to relief above the

20   speculative level, on the assumption that all the allegations in the complaint are true" the motion

21   must be denied. *Khmaissi*, 2021 WL 243396, at *1. Here, the factual allegations of the

22   Complaint are not only plausible but have been effectively admitted, and are more than sufficient

23   to support Bungie's claims for relief. The motion should be denied.

24

25   _____

26   [8] The Court may and should take judicial notice of that filing. Fed. R. Evid. 201; *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 8

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

**B.      L.L.'s Disaffirmance of the LSLA Requires Dismissal of the Breach of Contract Claims – But Also Renders All of his Prior Downloads, Plays, and Streams of *Destiny 2* Unlicensed and Infringing, and Concedes Bungie's Infringement Claims**

Faced with irrefutable allegations that he had breached the terms of the LSLA, L.L. decided to disaffirm the LSLA, rendering it a nullity and thereby eliminating any breach of contract liability. And L.L.'s disaffirmance did just that; under Washington law, disaffirmance rendered the contract *void ab initio*, thereby avoiding not only any future contractual obligations, but even liability for past breaches. *Plummer v. N. Pac. Ry. Co.*, 98 Wash. 67, 70, 167 P. 73, 74 (1917) ("The infant having elected to disaffirm the contract, ***it became void ab initio***") (emphasis added).[9] But the LSLA was a license agreement, and its mere existence was the only thing that rendered L.L.'s repeated downloads and plays of the *Destiny 2* software and audiovisual work non-infringing. By disaffirming the LSLA and rendering it *void ab initio*, L.L. has affirmatively conceded Bungie's claims that he infringed its copyrights in the *Destiny 2* software and audiovisual work, because he never had a valid license to do anything with them. Indeed, it is well-settled that a minor who disaffirms a contract must disaffirm the *entirety* of the agreement; he cannot disaffirm its burdensome provisions while keeping its beneficial ones. 5 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 9:14 (4th ed. 1993 & Supp. 2011). L.L.'s disaffirmance thus voided not only the LSLA-imposed obligations he breached, but also the LSLA-granted rights he relied on.

---

[9] Disaffirmance has a similar effect in many states. *See Boy Blue, Inc. v. Brown*, 74 Va. Cir. 4 (2007) (disaffirmance renders contract void *ab initio* under Virginia law); *Liberty Mut. Ins. Co. v. Conley*, 152 So. 2d 521, 523 (Fla. Dist. Ct. App. 1963) (explaining that under Florida law disaffirmance renders contract void *ab initio* as between the contracting parties, but that does not apply to burden third-parties); *Doenges-Long Motors, Inc. v. Gillen*, 138 Colo. 31, 38, 328 P.2d 1077, 1081 (1958) (minor who disaffirms contract under Colorado law "render[s] the contract nugatory *ab initio*"); *Windisch v. Farrow*, 159 S.W.2d 392, 394 (Mo. App. 1942) (same under Missouri law); *Smoot v. Ryan*, 187 Ala. 396, 399, 65 So. 828, 829 (1914) (same under Alabama law); *Gage v. Menczer*, 144 S.W. 717, 720 (Tex. Civ. App. 1912); *Harvey v. Briggs*, 68 Miss. 60, 8 So. 274, 276 (1890) (same under Mississippi law); *Boyden v. Boyden*, 50 Mass. 519, 521 (1845) (same under Massachusetts law).

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    Thus, while the Court should grant L.L.'s motion to dismiss the breach of contract claim,

2    Bungie intends to amend, after the Court's decision on the remaining branches of the motion,[10]

3    to assert that all of L.L.'s downloads, uses, and streams of *Destiny 2* were infringing, including

4    his initial download, uses, and streams prior to his first violation of the LSLA.

5          **C.**    **Bungie's Fraud in the Inducement Claim Was Well-Pled**

6          The party pleading fraud must "provide the who, what, when, where, and how" of the

7    facts that gave rise to the fraud claim. *McAfee v. Select Portfolio Servicing, Inc*., 193 Wn. App.

8    220, 232-33, 370 P.3d 25 (2016). A claim of fraudulent inducement is sufficiently pled where it

9    alleges all nine elements of fraud: (1) a representation of existing fact, (2) materiality, (3) falsity,

10   (4) the speaker's knowledge of falsity and (5) intent to induce reliance, (6) the listener's

11   ignorance of falsity, (7) reliance, and (8) right to rely on the representation, and (9) damage from

12   that reliance. *Petersen v. Turnbull*, 68 Wn.2d 231, 235, 412 P.2d 349 (1966); *Landstar Inway*

13   *Inc. v. Samrow*, 181 Wn. App. 109, 124, 325 P.3d 327 (2014).

14         Here, Bungie's pleading clearly alleges all nine elements. Every time L.L. "accepted" the

15   LSLA, he represented that he intended to be bound by the terms of the agreement, including its

16   prohibition on cheating. Complaint at ¶ 119. This representation is clearly material; not only does

17   Bungie prevent users from accessing *Destiny 2* until they agree to the LSLA, but the license

18   explicitly provides that it automatically terminates upon violation of the anti-cheating terms. *Id*.,

19   ¶ 139 and Ex. 1 at 3-4. The Complaint sufficiently alleges that L.L.'s representation was

20   knowingly false *at least* the thirteen or more times he signed up for a new account after having

21   already cheated; indeed, he bragged on Twitter about not intending to abide by the LSLA terms

22   when he made new accounts. Complaint at ¶¶ 68, 75. L.L. intended Bungie to rely on his

23   representation of his intent; after all, there was no other way he could play the game. *Id*., ¶ 114.

24

25   _____

[10] While Bungie believes its claims are well-pled, it would replead them if necessary to address any deficiency the Court might find in ruling on this motion. To avoid serial amendments, Bungie will delay amending to add the

26   copyright infringement claims created by L.L.'s disaffirmance until after the Court issues its ruling.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   Bungie had no way of knowing that L.L. was deceptive in his acceptance, and naturally relied on

2   his acceptance of the agreement. *Id*., ¶ 143. Bungie had the right to rely on representations made

3   in the acceptance of a contract. *Aventa Learning, Inc. v. K12, Inc*., 830 F. Supp. 2d 1083, 1100

4   (W.D. Wash. 2011) ("A party to whom a positive, distinct and definite representation has been

5   made is entitled to rely on that representation and need not make further inquiry") (quotation

6   omitted). And L.L.'s cheating behavior, made possible solely by his fraudulent acceptance of the

7   LSLA in light of Bungie's innocent reliance, has clearly harmed Bungie. Complaint at ¶¶ 19-21.

8          L.L.'s Motion challenges only one of these elements: Bungie's *actual* reliance on L.L.'s

9   representation of his intent to abide by the terms of the LSLA. Dkt. #18 at 12-13 ("Either way,

10  Bungie did not 'rely' on any misstatement of material fact …"). Of course, Bungie's reliance is a

11  factual issue, which Bungie pled and the Court must take as true on this motion. *See Cleverly v.*

12  *Ballantyne*, No. 212CV00444GMNGWF, 2013 WL 12320134, at *10 (D. Nev. Aug. 29, 2013)

13  (reliance is an issue to be addressed in discovery). Worse, L.L.'s support for that argument is

14  both legally and factually incorrect. Legally, the entire premise of L.L.'s argument – that minors

15  are "ineligible to enter into binding contracts" – is wrong. *Paulson v. McMillan*, 8 Wn. 2d 295,

16  299, 111 P.2d 983, 985 (1941) (minor is capable of making contracts, which are binding unless

17  and until disaffirmed). And factually, and without record support, L.L. theorizes that Bungie has

18  "*never … ever restricted Destiny 2* to adults over 18, or even sought to verify the age of players,"

19  Dkt. #18 at 12 (emphasis in original). But the LSLA specifically directs players under 18 to

20  obtain parental permission to agree to the license terms. Complaint, Ex. 1 at 2. And apparently

21  without irony, L.L. affirmatively cites the fact that Bungie "simply provided access to *Destiny 2*

22  whenever anyone signaled supposed 'assent' [to the LSLA] …," Dkt. #18 at 13 – a fact that

23  affirmatively establishes reliance, not rebuts it – as evidence of *nonreliance*. Of course, L.L.

24  completes that sentence by inventing the notion that the 'signal of assent' was given "simply by

25  playing *Destiny 2*" – but that factual claim is both not cognizable on a motion to dismiss and

26  egregiously wrong (the player must click their agreement to the LSLA in order to obtain access).

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 11

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    Complaint at ¶¶ 21, 155. And L.L's disaffirmance of the LSLA does not relieve him of liability

2    for his deception: "[b]ecause the duty to not commit fraud is independent of the contract, the

3    independent duty doctrine permits a party to pursue a fraud claim regardless of whether a

4    contract exists." *Jackowski v. Borchelt*, 174 Wn.2d 720, 738, 278 P.3d 1100, 1109 (2012)

5    (economic loss doctrine does not bar fraud claim where a contract covers the same subject

6    matter). The fraud in the inducement claim is well-pled, and cannot be dismissed.

7    **D.     Even Without the Disaffirmance or Fraud, L.L. Infringed Bungie's**
           **Copyrights**

8    

9            To successfully plead a claim for copyright infringement, Bungie need only allege its

10   ownership of copyrighted works and acts constituting infringement. *See Bell v. Wilmott Storage*

11   *Servs., LLC*, 12 F.4th 1065, 1071 (9th Cir. 2021). As alleged in the Complaint, Bungie owns the

12   copyrights in *Destiny 2* both as a software program and as an audiovisual work. Complaint at ¶

13   149. Thus, each time L.L. made unlicensed use of *Destiny 2*, he committed two separate

14   infringements: of the software program, because each time he played *Destiny 2* he created a copy

15   when he loaded the game into his device's RAM, *MAI Systems Corp. v. Peak Computer, Inc*.,

16   991 F.2d 511, 518 (9th Cir. 1993), and the audiovisual work – the game's "story itself" – as he

17   reproduced and displayed it on his screen and speakers by playing it. *Micro Star v. Formgen Inc*.,

18   154 F.3d 1107, 1112 (9th Cir. 1998). As noted above, L.L.'s disaffirmance of "any and all

19   contracts between himself and Bungie" rendered each of his uses of *Destiny 2* infringing. *See*

20   *Oracle USA, Inc. v. Rimini Street, Inc*., 879 F.3d 948, 954 (9th Cir. 2018) (licensee who exceeds

21   scope of license is liable for copyright infringement). Even were that not so, Bungie banned L.L.

22   from the game and, as discussed above, any subsequent play on new accounts was unlicensed

23   because L.L. fraudulently represented his intent to abide by the LSLA's terms. For those reasons

24   alone, Bungie has stated a claim for infringement. But even if L.L. had ever possessed a valid

25   license to *Destiny 2*, his cheating still infringed Bungie's copyrights, for two reasons: both

26   because the use of cheat software breached the LSLA's express conditions and thereby

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   terminated any license L.L. otherwise had, and because the cheating itself involved the

2   unauthorized creation of a derivative work.

3       1.      **L.L.'s Use of Cheat Software Terminated the LSLA and Rendered
                His Use of *Destiny 2* Infringing**

4

5       The breach of a video game license by cheating is copyright infringement under two

6   circumstances: (1) if the breached license provision is a condition of the license; or (2) if the

7   breach implicates one of the rights holder's exclusive rights. *MDY*, 629 F.3d 939-40. Both are

8   implicated here. First, Bungie expressly designated the LSLA's anti-cheat provisions as a

9   conditions of the license to *Destiny 2*, explicitly informing its users that cheating vitiates the

10  license and renders continued use of the program infringing. Complaint, Ex 1 at 3-4. Even were

11  that not so, the cheat software L.L used creates an unlicensed derivative work from *Destiny 2*.

12  Complaint, ¶¶ 151-153. Under either prong of *MDY*, L.L.'s use of cheat software thus rendered

13  his subsequent uses of *Destiny 2* infringing, as pled in the Complaint, and the Motion must be

14  denied.

15      a.      **The anti-cheat provisions of the LSLA are conditions, not covenants,
                and L.L.'s breach therefore vitiated the license**

16      The relevant provisions of the Bungie LSLA read as follows:[11]

17          LICENSE ***CONDITIONS***: This license is subject to the following
            limitations ("License Limitations"). ***Any use of the Program in***
18          ***violation of the License Limitations will result in an immediate***
            ***termination of your license, and continued use of the Program***
19          ***will be an infringement of Bungie's copyrights in and to the***
            ***Program***. You agree that you will not do, or allow, any of the
20          following: … (7) reverse engineer, derive source code, modify,
            decompile, disassemble, ***or create derivative works of this***
21          ***Program***, in whole or in part, or of any middleware required for
            use of this Program such as anti-cheat software; (8) hack or modify
22          the Program, or create, develop, modify, distribute, or use any
            unauthorized software programs to gain advantage in any online or
23          multiplayer game modes; (9) receive or provide "boosting

24
_____

25  [11] In attempting to analogize this provision of the LSLA to the license at issue in *MDY*, the Motion simply chops off
    both the express designation of the provisions as "CONDITIONS" and the explicit agreement of the parties that
26  breach automatically terminates the license and renders any continued use unlicensed and infringing. Dkt. #18 at 16.


PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 13

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

services," to advance progress or achieve results that are not solely based on the account holder's gameplay…

Complaint, Ex. 1 at 3-4 (emphasis added).

This provision is a condition. *See MDY*, 629 F.3d at 939 ("We distinguish between conditions and covenants according to state contract law"). *See also* Complaint, Ex 1 at 15 (contract to be construed according to Washington law). Under Washington law, the breach of a condition "prevents the promisor… from acquiring a right…or deprives it of one." *Tacoma Northpark, LLC v. NW, LLC*, 123 Wn. App. 73, 79, 96 P.3d 454, 457 (2004). If the contract unambiguously designates a license limitation as a condition, "the court construes it according to its terms." *MDY*, 629 F.3d at 939. The language used here is unambiguous. Not only does it identify the "License Limitations" as "LICENSE CONDITIONS," but the LSLA includes the parties' express agreement that breach of the conditions "will result in an immediate termination of your license, and continued use of the Program will be an infringement of Bungie's copyrights." Complaint, Ex. 1 at 3. It specifies both that the failure to meet the specified condition ends Bungie's obligation to continue to provide a license and that Bungie's remedy is not contractual; it lies in copyright. *Id.*; *c.f. MDY*, 629 F.3d at 940 (holding that a provision was not a condition in part because "nothing in that section conditions Blizzard's grant of a limited license on player's compliance"). Thus, under *MDY*, the Court must construe it as a condition of the license, whose breach vitiates the license.

The *MDY* court also explained that ambiguous contractual provisions were to be construed as covenants, rather than conditions, to avoid arbitrary attempts to "designate any disfavored conduct during software use as copyright infringement." *MDY*, 629 F.3d at 941. But that does not help L.L. here, for two reasons. First, because, as noted above, the language here is not ambiguous; the Court cannot require Bungie to license *Destiny 2* on terms that it never agreed to, and Bungie only agreed to license *Destiny 2* on terms that terminate automatically upon the use of cheat software. And second, and equally importantly, making the anti-cheat

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   provisions a condition of the license is not arbitrary. Bungie makes *Destiny 2* available on a free-

2   to-play basis, and in that context, the LSLA's conditions are "both clear and necessary to

3   accomplish the objectives" of the copyright holder, including economic benefits. *Jacobsen v.*

4   *Katzer*, 535 F.3d 1373, 1381 (Fed. Cir. 2008). As explained above, Bungie's sole income from

5   its free-to-play game depends on the very customer satisfaction that cheating directly attacks, and

6   preventing cheating is key to Bungie obtaining economic value from its game. Thus, as in

7   *Jacobsen*, the conditions of the LSLA are "vital to enable the copyright holder to retain the

8   ability to benefit" from the agreement. *Id*. L.L.'s breach of these express and unambiguous

9   conditions rendered his use of *Destiny 2* infringing.

10          **b.      Even if the Court construed the "License Limitations" as covenants,**
11                    **L.L.'s use of cheat software would still infringe**

12          Even if the anti-cheating provisions are construed as covenants, the end result is the

13   same: L.L.'s cheating infringes Bungie's copyrights. The breach of a license covenant is

14   infringement "where the licensee's action (1) exceeds the license's scope (2) in a manner that

15   implicates once of the licensor's exclusive statutory rights." *MDY*, 629 F.3d at 940. Both

16   conditions are fulfilled here.

17          There is no question that, as in *MDY*, L.L's cheating violated the license. L.L. argues that

18   *MDY* held that no breach of a contractual covenant restricting cheating could ever be the basis of

19   an infringement claim, because the specific form of cheating at issue in *MDY* – automating

20   gameplay – did not implicate the licensor's rights under copyright. Dkt. #18 at 16. But he ignores

21   *MDY*'s express holding that a user's breach of the provision that forbade creation of derivative

22   works would "exceed the scope of her license and violate one of Blizzard's exclusive rights

23   under the Copyright Act." *MDY*, 629 F.3d at 940-41. Here, Bungie's LSLA likewise forbids

24   "create[ing] derivative works of this Program." Complaint, Ex. 1 at 5. And Bungie pled in its

25   complaint that "the cheat software Defendant used creates visual elements that are displayed as

26   an overlay on, and within the *Destiny 2* visual display," Complaint at ¶ 151; "the combined

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 15

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  audiovisual work displayed by the interaction between Bungie's *Destiny 2* software and the cheat

2  software…is based on – but meaningfully different from" the original, *Id.*, ¶ 152; and this

3  resulted in an infringing unauthorized derivative work, *id.*, ¶ 153.[12]

4      Defendant's argument that Bungie cannot "properly claim that use of 'cheat software'

5  results in the creation of a 'derivative work,'" Dkt. #18 at 17, is based on a fundamental

6  misunderstanding of *Lewis Galoob Toys, Inc. v. Nintendo of America*, 964 F.2d 965 (9th Cir.

7  1992). In *Galoob*, the court analyzed a cheating device from the early game console era, the

8  "Game Genie," which was a physical device placed in between the game cartridge and did not

9  copy or manipulate the data stored in game cartridge ROM. *Galoob*, 964 F.2d at 967. The Game

10  Genie "[could] not produce an audiovisual display; the underlying display [was] produced by a

11  Nintendo Entertainment System and game cartridge." *Id.* at 968. Here, as Bungie has plead in its

12  complaint, the cheat software L.L. used not only modifies the contents of *Destiny 2* data

13  structures in memory but also "creates visual elements." Complaint at ¶ 151. These novel visual

14  elements are readily apparent in the video clips L.L. recorded and posted to his Twitter

15  account.[13] *Id.*, ¶ 66. And cheat software that provides these kinds of visual overlays creates a

16  derivative work. *See, e.g.*, *Blizzard Entm't, Inc. v. Bossland GmbH*, SACV161236DOCKESX,

17  2017 WL 7806600, at *5 (C.D. Cal. Mar. 31, 2017) (allegation that cheat program created a

18  dynamic screen overlay incorporated into the game's display established infringement for

19  purposes of default judgment). At this stage of the proceedings, that is outcome determinative;

20  Bungie's Complaint sufficiently alleges that the cheat software L.L. used in breach of the license

21  violated Bungie's exclusive statutory right to authorize the creation of derivative works. As such,

22

23  [12] The "Glider" software at issue in *MDY*, in contrast, was never alleged to create a derivative work in any way; it merely automated in-game tasks for the user. *See MDY*, 629 F.3d at 935 (describing Glider as "a software 'bot'…that automates play of WoW's early levels" but which "does not alter or copy WoW's game client software.")

24

25  [13] To the extent that *Galoob* turned on a lack of fixation not addressed by the original audiovisual elements created by the cheat software, the infringing derivative work was fixed in these clips. And even if it had not been, it was fixed in the cheat software files describing the annotated display. *Microstar*, 154 F.3d at 1111-12 (video game map levels displayed in game were fixed in the underlying game files).

26

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 16

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    even were the LSLA terms construed as a covenant, *MDY* would still allow Bungie to bring an

2    infringement suit based on the breach.

3    **b.      L.L.'s Use of Cheat Software Infringed by Creating a Derivative Work**

4    And, for the same reason, Bungie properly pled infringement even if L.L. were somehow

5    protected by the license from the day he first played *Destiny 2* until the day he stopped, despite

6    his disaffirmance, fraud, and breaches of the license conditions. The LSLA never licensed L.L.

7    to create derivative works, and – as just discussed in detail – Bungie properly alleged that L.L.

8    created derivative works each time he used cheat software. As such, Bungie's copyright

9    infringement claim is well-pled, and cannot be dismissed.

10   **E.      L.L.'s Anticircumvention Defenses Fail**

11   On June 11, 2022, Defendant tweeted "7 bans in and still going strong @Bungie battleye

12   is shit took me 30 seconds to get around your silly hardware ban." Complaint at ¶ 75. Standing

13   alone, this tweet sufficiently establishes a violation of the DMCA's anti-circumvention

14   provisions: it contains L.L.'s admission of his awareness of specific TPMs (account bans,

15   BattlEye and hardware ID bans) and his active (and successful) attempts to avoid them, which is

16   all that is necessary to show a violation of 17 U.S.C. § 1201(a)(3).[14] In light of that tweet –

17   alleged in the Complaint and never so much as addressed in Defendant's Motion – the motion to

18   dismiss must be denied.

19   Indeed, L.L.'s arguments rest on an incomplete accounting of L.L.'s activities – eliding

20   L.L.'s use of hardware spoofing and ban evasion while discussing only his use of cheat software.

21   And as a legal matter, L.L.'s arguments misread both the anticircumvention statute (confusing it

22   with the Computer Fraud and Abuse Act and therefore focusing on which computer contains the

23

---

24   [14] A TPM is circumvented when (a) a technological measure that effectively controls access; (b) to a copyright-
     protected work; (c) has been circumvented. *See Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068,
25   1072 (S.D. Cal. 2019). To circumvent a TPM means to descramble or decrypt a protected work, or "***otherwise*** to
     avoid, bypass, remove, deactivate, or impair" a TPM. 17 U.S.C. §1201(a)(3) (emphasis added). There is no dispute
26   that *Destiny 2* is a copyright-protected work.

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 17

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  protected data rather than on whether and how L.L. circumvented technological protective

2  measures to access portions of a protected work) and *MDY*. Bungie's claim under 17 U.S.C.

3  § 1201(a) is well pled, supported both by the facts as pled in Bungie's complaint and the

4  statutory text of the DMCA.

5       Bungie's Complaint identified five types of TPM that L.L. circumvented in order to gain

6  access to *Destiny 2* and to the portions of its data that Bungie protects from player access: (1)

7  hardware ID technology the Bungie uses to prevent circumvention of account bans; (2) Bungie's

8  anti-cheat technology that automatically scans for indicators of cheating; (3) software design that

9  hides from *Destiny 2* players much of the enemy positioning data that the server provides the

10  client in order to allow both gameplay and the scrambled positioning data that *Destiny 2* is

11  designed to show players; (4) account bans that prevent unlicensed players from continuing to

12  access *Destiny 2*; and (5) the requirement that players agree to the LSLA before the software will

13  allow access to *Destiny 2*. Yet L.L.'s motion to dismiss is curiously and notably silent as to most

14  of those TPMs, and most of L.L.'s conduct at issue. Indeed, as to the first TPM – hardware ID

15  bans – L.L.'s Motion says nothing at all, for obvious reasons. The Complaint alleged L.L.'s

16  tweet affirmatively bragging about circumventing that TPM, and not even L.L. can imagine an

17  argument for dismissal of that claim.

18       Instead, L.L. only bothered to address two of the anticircumvention allegations: (1) his

19  use of cheat software specifically designed to avoid detection by Bungie's anti-cheat technology

20  and (2) his use of cheat software that hacked *Destiny 2*'s software to access and display data that

21  Bungie's software rendered only in a scrambled, imprecise form. As to the former, in *MDY*, the

22  Ninth Circuit reached two legal conclusions that are binding on this Court and outcome

23  determinative. First, the Ninth Circuit held that anti-cheat software is a TPM under the DMCA.

24  *MDY*, 629 F.3d at 943, 954 And second, the Ninth Circuit held that cheat software designed to

25  attempt to avoid detection by anti-cheat software is a device "primarily designed … for the

26  purpose of circumventing a technological measure that effectively controls access to a work

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    protected under this title." 17 U.S.C. § 1201(a)(2); *MDY*, 629 F.3d at 953-954. Those twin

2    holdings doom L.L. here: Bungie pled that it uses anti-cheat software, and that L.L. used cheat

3    software that was designed to avoid detection by Bungie's anti-cheat software. Complaint at ¶¶

4    170-171. Indeed, L.L. bragged on Twitter about avoiding detection by BattlEye, Bungie's anti-

5    cheat software. Complaint at ¶ 75. Under *MDY*, Bungie's allegations are thus sufficient in and of

6    themselves to support an anticircumvention claim.

7            L.L.'s only "argument" is to pretend that the anticircumvention statute prohibits only

8    technologically disabling Bungie's anti-cheat technology, rather than merely avoiding detection

9    by it. Dkt. #18 at 17 ("any such claim requires that Bungie allege facts sufficient to show that

10   L.L. took active steps to disable or otherwise remove supposed 'anti cheat' software"). But that

11   is not what the statute says. A user violates the DMCA's anticircumvention provisions not only

12   when he "descramble[s] a scrambled work" or "decrypt[s] an encrypted work" but also when he

13   otherwise "**avoid[s], bypass[es]**, remove[s], deactivate[s], or impair[s] a technological measure."

14   17 U.S.C. § 1201(a)(3)(A) (emphasis added). Congress included "avoid" and "bypass" to capture

15   exactly this behavior, and the Court cannot ignore those words. *See U.S. v. Watkins*, 278 F.3d

16   961, 966 (9th Cir. 2002) ("courts are to accord a meaning, if possible, to every word in a

17   statute") (cleaned up). As the Ninth Circuit has already held, a user avoids a TPM when he

18   contorts his behavior to avoid detection by that technologically protective measure, which is

19   what Bungie alleges L.L. did here. *MDY*, 629 F.3d at 936 (software designed to avoid detection

20   is a circumvention device).

21           Similarly, the *Destiny 2* software intentionally renders enemy positioning data in an

22   imprecise fashion, Complaint, at ¶¶ 166-167, and L.L. therefore also evades that TPM when he

23   uses cheat software that hacks *Destiny 2* and effectively decrypts or descrambles enemy

24   positioning data in order to precisely display it to cheaters like him. As Bungie alleged, the

25   *Destiny 2* software operates to control what data is and is not visible to *Destiny 2* users, *id.*, and

26   the cheat software L.L. used avoided that access control.  *Id.*, ¶ 172. L.L.'s only argument that

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 19

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   this is not a circumvention of access controls is that "the data Bungie claims to obfuscate is

2   actually resident on L.L.'s own computer, not on any Bungie server" and, therefore, cheaters are

3   "simply accessing data that is in their own computers, which they own …" Dkt. #18 at 18

4   (emphasis in original). But where the data resides is irrelevant to a DMCA anti-circumvention

5   claim. Unlike the Computer Fraud and Abuse Act, which criminalizes unauthorized access to

6   protected computers, 18 U.S.C. § 1030(a)(1), the DMCA bars users from circumventing TPMs

7   that control access to copyrighted works. 17 U.S.C. § 1201(a)(1). That is true regardless of where

8   the work resides. *Cf. Rimini Street*, 473 F.Supp.3d at 1196 (where work resides is irrelevant to

9   infringement). A user who purchases and downloads Renaissance to their own computer does not

10  thereby gain the right to disable any access controls to Beyonce's latest album simply because it

11  "is actually resident on [the user's] own computer, not on any [Beyonce] server." In order to

12  annotate the *Destiny 2* display, the cheat software L.L. employed bludgeons its way into code

13  and information that the *Destiny 2* software design expressly protected against such access; it

14  thereby circumvented Bungie's TPM protecting that data and the *Destiny 2* work. Whether that

15  happens client-side or server-side may matter to the CFAA (it does not, for reasons too technical

16  and irrelevant to address here). It has no conceivable impact at all on L.L.'s violation of

17  17 U.S.C. § 1201(a),[15] and the motion to dismiss must be denied for that reason as well.

18          Finally, L.L. entirely ignores his circumvention of the player account system that controls

19  access to *Destiny 2*. Measures such as passwords and license key databases are TPMs when they

---

[15] Charitably, L.L. may simply be badly misreading a *different* part of *MDY* – its holding that Blizzard's anti-cheat technology, Warden, did not "effectively control access to" various files resident on the user's computer, because Warden operated only when the user logged into the server. *MDY*, 629 F.3d at 952. Thus, accessing those files could not be an anti-circumvention violation because access to them was, in at least some circumstances, not controlled by *any* TPM. *Id.* at 953 (access not effectively controlled where Blizzard "leaves open the ability to access these elements directly via the user's computer"). Here, however, the TPM L.L. is allegedly avoiding is not only Bungie's anti-cheat technology, but also its software design that scrambles the presentation of location data when the game is played. Complaint at ¶¶ 166-167. More, unlike the files addressed by the *MDY* court, that location data is *not* accessible to L.L. unless and until he is connected to the server and actively playing the game; it does not even exist except in those circumstances. *Id.* (discussing data relating to player positioning in-game). Thus, there is no form of "access" to that data that is uncontrolled by a Bungie TPM, and circumventing those TPMs remains an anticircumvention violation.  At this stage of the proceedings, Bungie's allegations should be sufficient.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

control access to copyright-protected works. *See*, *e.g.*, *Davidson & Associates v. Jung*, 422 F.3d 630, 640 (8ᵗʰ Cir. 2005) (CD key constituted TPM); *Microsoft Corp. v. EEE Business Inc*., 555 F.Supp. 2d 1051, 1059 (N.D. Cal. 2008) (25-character volume license key is TPM); *Synopsys, Inc. v. InnoGrit, Corp*., 19-CV-02082-LHK, 2019 WL 4848387, at *8 (N.D. Cal. Oct. 1, 2019) (unauthorized use of license keys and passwords constitutes circumvention) (collecting cases). The same logic applies to the player database that serves as the guardian to *Destiny 2*. Access to *Destiny 2* requires a valid Bungie account; when a player attempts to use an account to log in, their account is checked and access is denied if the account has been banned. Complaint at ¶¶ 74, 168. This login step controls access to the game and is functionally no different from any other type of password or key restriction. *See*, *Davidson & Associates*, 422 F.3d at 640 (describing step where game checks CD key as a "secret handshake" regulating access). L.L. "otherwise avoided" Bungie's account bans each time that he fraudulently clicked the "I agree" button to agree to the LSLA, knowing full well that he intended to breach the license by cheating, and thereby caused a new account and associated access authorization to be generated. As L.L. acknowledged in his tweets and Bungie pled in its Complaint, he deliberately circumvented those technological measures that blocked his access to the game in order to regain continued access to *Destiny 2* even after he was banned. Complaint at ¶¶ 24-53, 65-70, 75, 170, 175. L.L.'s motion does not address these violations of the anticircumvention statute, and this claim therefore cannot be dismissed.

### F.   Bungie's Claim for Violation of the Washington Consumer Protection Act is Well-Pled

A claim for violations of the Washington Consumer Protection Act, RCW 19.86.090, requires a plaintiff to show "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Wash*., 166 Wn.2d 27, 37, 204 P.3d 885 (2009). Bungie has pled L.L.'s manifold unfair and deceptive practices. Complaint at ¶¶ 65-87, 100. It

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 21

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    specifically pled his acts occurred in commerce. *Id.*, ¶¶ 125, 180.  It pled that L.L.'s conduct

2    affects the public interest. *Id.*, ¶¶ 182. And it pled damage from L.L.'s conduct. *Id.*, ¶¶ 7-8, 20,

3    183. L.L. offers no argument or explanation to the contrary, and the facts as pled in the

4    complaint are clear and plain.

5           L.L. instead rests his entire motion to dismiss Bungie's CPA claims on two assertions:

6    that because there is no statute L.L. violated, and because L.L.'s threats constituted

7    "constitutionally protected speech", no claim under the CPA against him can be valid. Dkt. #18

8    at 13-14. These sparse and conclusory arguments are meritless. A CPA claim need not allege that

9    the conduct at issue violated any statute. "[A] claim under the Washington CPA may be

10   predicated upon a per se violation of statute, an act or practice that has the capacity to deceive

11   substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute

12   but in violation of public interest." *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787, 295 P.3d

13   1179 (2013). L.L.'s emblems sales, which steal money from Bungie's charity drives and devalue

14   the rewards Bungie offers its players, all in violation of the contractual terms on which Bungie

15   makes emblems available to users, are clearly unfair – whether or not L.L. personally

16   disaffirmed his own license.[16] Moreover, the deceptive collection notices at issue in *Panag*

17   constituted a form of speech, but the Washington Supreme Court had no difficulty still finding

18   that the "speech" violated the CPA. *Panag*, 166 Wn.2d at 39.

19          In sum, RCW 19.86.920 declares that the purpose of the CPA "is to complement the body

20   of federal law governing restraints of trade, unfair competition and unfair, deceptive, and

21   fraudulent acts or practices in order to protect the public and foster fair and honest competition"

22   and declares it is "the intent of the legislature that, in construing this act, the courts be guided by

23   final decisions of the federal courts and final orders of the federal trade commission interpreting

24   the various federal statutes dealing with the same or similar matters." Bungie has alleged facts

25

26   [16] Indeed, L.L.'s purchase of the emblems from his source will support an amendment alleging tortious interference with that source's license agreement.

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 22

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  that fit squarely within that broad statutory purpose and scope, and the motion to dismiss this

2  claim should be denied.

3                                IV.   **CONCLUSION**

4          L.L. is a minor, and the law protects minors from liability arising from their poorly-

5  considered contractual agreements. But the law provides minors with no right to defraud

6  licensors, no right to infringe copyrights, no right to play copyright-protected video games

7  except under the terms of the license that the rights-holder is willing to extend, and no right to

8  circumvent technological protection measures implemented by a rights-holder to control access

9  to a copyright protected work and its data. Moreover, the law does not provide minors with a

10  special haven from civil liability that may arise or be exacerbated when, through and perhaps in

11  reliance on the advice of experienced counsel, they choose to disaffirm any number of license

12  agreements that may otherwise have authorized infringing conduct. Nor does the law allow

13  minors to engage in unfair and deceptive commercial acts so long as those acts were also

14  prohibited by a contract the minor later disaffirms. Bungie has more than sufficiently pled the

15  elements of its causes of action; indeed, L.L.'s own public tweets and streams conclusively prove

16  that Bungie will ultimately succeed on those claims. The Motion should be denied.

17          DATED this 26th day of September, 2022.

18

19                                          s/ *Brian W. Esler*
                                           Brian W. Esler, WSBA No. 22168
20                                          MILLER NASH LLP
                                           Pier 70
21                                          2801 Alaskan Way, Suite 300
                                           Seattle, WA 98121
22                                          Telephone: (206) 624-8300
                                           Fax: (206) 340-9599
23                                          Email: brian.esler@millernash.com

24

25

26

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 23

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1
2   Akiva M. Cohen, New York Bar No. 4328969
    (Admitted *pro hac vic*)
3   KAMERMAN, UNCYK, SONIKER
    & KLEIN, P.C.
4   1700 Broadway
    New York, NY 10019
5   Telephone: (212) 400-4930
    Email: acohen@kusklaw.com

6   Dylan M. Schmeyer, Colorado Bar No. 50573
    (Admitted *pro hac vice*)
7   KAMERMAN, UNCYK, SONIKER
    & KLEIN, P.C.
8   750 W. 148th Ave #4216
    Westminster, CO 80023
9   Telephone: (719) 930-5942
    Email: dschmeyer@kusklaw.com
10
    Attorneys for Plaintiff
11
    4890-7801-8869.1
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT L.L.'S MOTION TO DISMISS - 24

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121